

Signed and Filed: October 20, 2011

_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

```
In re                              ) Bankruptcy Case
                                   ) No. 08-30750DM
CHURCH OF GOD IN CHRIST #2, dba    )
Little Chapel of God In Christ,    ) Chapter 11
a California Corporation,          )
                                   )
                    Debtor.        )
_____)
CHURCH OF GOD CHRIST #2, dba       ) Adversary Proceeding
LITTLE CHURCH OF GOD IN CHRIST,    ) No. 08-3126DM
a California Corporation,          )
                                   )
                    Plaintiff,     )
                                   )
v.                                 )
                                   )
BDM MORTGAGE SERVICES, INC., a     )
California Corporation, et al.,    )
                                   )
                    Defendants.    )
_____)
```

MEMORANDUM DECISION ON COMPLAINT
FOR NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

I. INTRODUCTION

On June 27 and 28, 2011, the court conducted a trial in this adversary proceeding. Plaintiff Church of God In Christ #2 ("Plaintiff") appeared and was represented by Ruth Elin Auerbach, Esq., its attorney. Defendants BDM Mortgage Services, Inc. ("BDM") and Daniel Aranda ("Aranda") appeared and were represented by Stanley P. Lieber, Esq., their attorney. All other defendants

-1-

have been dismissed or have settled.

During the course of the trial the court determined that Plaintiff had not made a prima facie case as to Aranda and indicated that it would enter judgment in his favor.

For the reasons discussed below, the court will also enter judgment in favor of BDM. Although BDM acted negligently and breached a fiduciary duty to Plaintiff, its conduct was not the substantial cause of Plaintiff's claimed losses and therefore it cannot be held liable for those losses.

## II.  PROCEDURAL BACKGROUND

Plaintiff commenced this adversary proceeding on October 17, 2008. In paragraph 3 of the complaint Plaintiff alleged that this is a "core" matter. In its answer, BDM did not respond to that allegation and thus it is deemed admitted. Accordingly, the court determines that this matter is core (see 28 U.S.C. § 157(b)); if not core, it clearly is related to the Plaintiff's Chapter 11 case and thus BDM, by virtue of its response, has consented to this court entering findings of fact and conclusions of law and a final judgment. See 28 U.S.C. § 157(c)(1) & (2).

## III. DISCUSSION[1]

In February, 2004, Joseph King, Jr. ("King") was the Senior Pastor of Plaintiff. Timothy Russell ("Russell") was the Senior Pastor of Word 2 Heart Ministries ("Word"). King and Russell executed a Letter of Intent to Merge Non-Profit Entities (Exhibit 6) to merge Plaintiff and Word into a newly merged entity to be named in a merger agreement. Though the merger did not take

---

[1] The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052(a).

-2-

place, never being approved by the vote of the membership of Plaintiff, Russell was designated Co-Pastor of Plaintiff, and his sister, Jamesetta Russell, was designated as Chief Financial Officer.

Around the same time Russell contacted Aranda at BDM, a mortgage broker, to negotiate a loan for Plaintiff. Aranda requested certain information and documentation from Russell, including a copy of Plaintiff's By-Laws. He did not request or obtain a Statement of Officers of Plaintiff from the Secretary of State of California. Aranda did not read Plaintiff's By-Laws but forwarded them to the title company that was going to be involved in the loan transactions described below.

BDM brokered and thereafter serviced a loan of $238,000 from third party lenders to Plaintiff. That loan (the "First Loan") was evidenced by a Note Secured By a Deed of Trust (Exhibit 1) signed by Russell on April 25, 2004, and Jamesetta Russell on April 26, 2004 and notarized by Aranda after that outside the presence of the Russells. In connection with the First Loan Russell provided BDM with a Letter of Resolution (Exhibit 9) that reflected that Plaintiff's board had authorized BDM to arrange a loan of $215,000, secured by Plaintiff's real estate on Turk Street in San Francisco (the "Church"). The Letter of Resolution purported to authorize Russell and Jamesetta Russell to execute all loan documents. Russell signed King's name. There is no evidence that King knew that Russell did so. There is no evidence that Plaintiff's Board approved or ratified this loan.

Plaintiff's By-Laws (Exhibit 4) provide that the Pastor/President/Chief Executive Officer are interchangeable terms

to denote the spiritual leader of Plaintiff. They also indicate that the President shall be the Executive Officer of the corporation and that He may sign with the secretary and any other proper officer of the corporation ... deeds, mortgages, bonds, ...." (By-Laws 7). Exhibit 1 was not signed by a third officer as required by the By-Laws.

In June, 2005, BDM brokered a second loan to Plaintiff, this time for $84,500. That loan (the "Second Loan") was evidenced by a second Note Secured By a Deed of Trust (Exhibit 2) and was signed by Russell and Jamesetta Russell but not by a third officer as required by the By-Laws. In connection with that loan Russell again signed King's name to a Letter of Resolution (Exhibit 10) that was similar to the earlier one. There is no evidence that King knew that Russell did so. There is no evidence that Plaintiff's Board approved or ratified this loan.

In January, 2006, BDM brokered a third loan (the "Third Loan") whereby Plaintiff borrowed the sum of $372,500, most of which went to refinance the First Loan and the Second Loan and out of which Plaintiff received a net of just over $30,000. As with the earlier notes, the third Note Secured By a Deed of Trust (Exhibit 3) was executed by Russell and Jamesetta Russell. Russell signed King's name to a Letter of Resolution that was similar to the two earlier ones. There is no evidence that Plaintiff's Board approved or ratified this loan. At the time of the Third Loan the First Loan and the Second Loan were both current. BDM received payments on the Third Loan for several months before the loan went into default.

Shortly after the First Loan was funded a letter dated May 3,

-4-

2004 (Exhibit L), was executed wherein King purported to authorize Russell to act on his behalf as Chief Executive Officer of Plaintiff and authorized him to procure funds to be secured by the Church for purposes of remodeling and maintaining the property and establishing new programs. There is no evidence that the May 3, 2004 letter was provided to BDM until October, 2006, after all three loans had been funded. In fact, Aranda could not recall when he first saw the letter or if and when he relied on it to make any of the three loans. He did not request it.

Plaintiff contends that because the three loans were never properly authorized in accordance with its By-Laws, that BDM is liable to it for a total amount which it is obligated to pay the lenders who made it, plus the amount of money it borrowed from others to service the BDM loans, plus attorneys fees incurred in state court proceedings and in this court. Plaintiff contends and BDM disputes that BDM owed it a fiduciary duty that gives rise to this liability; in the alternative it contends and BDM also disputes that BDM negligently permitted Plaintiff, primarily through the actions of Russell, to borrow the funds when it was unable to pay for them. Finally, BDM contends that regardless of its conduct, it was not the proximate cause of Plaintiff's loss - Russell was. It argues that even if BDM breached a fiduciary duty or was negligent, that conduct did not cause compensable damages it should pay. The court agrees with BDM on this final point.

To support its theory that BDM owed it a fiduciary duty, Plaintiff surprisingly cites California Civil Code section 2923.1, a section plainly limited to residential mortgage loan services.

Nevertheless, subparagraph (c) makes clear that the statute does not limit any other fiduciary duty and Wyatt v. Union Mortgage Co., 24 Cal.3d 773 (1979) stands for the proposition that a mortgage broker acts in a fiduciary capacity that imposes upon it the duty of acting in the highest good faith towards its principal. Accordingly, the court determines that BDM, insofar as it acted as a mortgage broker in these transactions, did owe a fiduciary duty to Plaintiff.

BDM relies on cases that hold mortgage brokers to a duty to be forthcoming about loan terms and required payments. Here there was absolutely no disclosure of terms or payment requirements to Plaintiff, the borrower. The disclosures were to Russell and his sister. BDM agreed to serve Plaintiff and then failed to ensure that Plaintiff knew the loan terms it was committing to three separate times.

In the alternative Plaintiff contends that BDM was negligent. It was. It failed to do its appropriate and fundamental diligence and ascertain that Plaintiff had properly authorized the three loans that are the subject of this litigation. It relied primarily on Russell and the Letters of Resolution and ignored the clear terms of Plaintiff's by-laws requiring three, not two, corporate officers to execute deeds and mortgages. The court rejects as unpersuasive BDM's contention that reviewing the by-laws was the duty of the title company. If in fact a title company failed to carry out its duties that is between it and BDM; BDM cannot exonerate itself from its failure to protect its principal, Plaintiff, from the consequences of its own negligence

-6-

Case: 08-03126    Doc# 65    Filed: 10/20/11    Entered: 10/21/11 10:14:51    Page 6 of 13

or breach of duty.[2] But that, too, is of no moment because Plaintiff reaped several benefits from the three loans and what harm it suffered at the hands of Russell was not caused by BDM. Its conduct was not a "substantial factor" that caused that harm. Lysick v. Walcom 258 Cal.App.2d 136 (1968); Brantley v. Boyd, 07-6139 SC, 2011 WL 1225630 (N.D. Cal April 1, 2011).

As discussed more fully below, most of the money loaned on the First Loan, the Second Loan and the Third Loan directly or indirectly benefitted Plaintiff by compensating Pastor King and providing necessary repairs and maintenance of the Church even if its Board did not specifically authorize the loans. Another large portion of the money actually serviced the debts. To award Plaintiff damages for these benefits would unjustly enrich it.

To the extent Russell diverted some of the loan proceeds for Word or for his own purposes, the damage caused to Plaintiff by that conduct was not foreseeable by BDM. Its conduct in recommending that the loans be made without proper corporate borrowing authority admittedly caused the money to become available; it did not lead to Russell's conduct in setting up a separate bank account (the "Wells Fargo account") that he and his sister controlled in Plaintiff's name nor to his misuse of some of the funds in that account.

---

[2] BDM contends that Plaintiff has failed to carry its burden to prove negligence by a failing to call an expert witness to testify as to the standard of care in the relevant community.
   The court disagrees with BDM and accepts that when facts giving rise to a Plaintiff's negligence are within the experience and understanding of individuals with common intelligence and education, no such expert testimony is required. Simonton v. Pierce, 165 Cal. App. 2d 163 (1958). Because the court is granting judgment in favor of BDM its decision that no experts were required is of no real consequence to BDM.

-7-

One of the problems the court has been confronted with is to quantify exactly how much Plaintiff was benefitted by the loans. The first challenge has been to calculate how much money was actually available. Neither counsel set that forth the amounts specifically, but the court was able to examine the bank records (Exhibit 12) and determine that in April, 2004, from the First Loan, deposits were made to the Wells Fargo account in the sums of $115,219.42 and $100,054.52. In June, 2005, from the Second Loan, there was a deposit of $75,744.33. In January, 2006, from the Third Loan, there was a deposit of $30,242.07. Thus the three loans resulted in receipts, net of closing costs,, fees, etc., totaling $321,260.34.

At a minimum the evidence establishes that at least $93,077.58 of the loan proceeds were used to pay King's salary. This amount was not set forth specifically by BDM's counsel but is derived from Exhibit 12, which shows that between June, 2004 and February, 2006, payments were made from the Wells Fargo account to Paychex for payroll, payroll taxes and Paychex invoices that totaled $54,001.26, $15,953.81 and $2,353.51, respectively, plus from Exhibit M-2, which shows another 20,769.15 for King's compensation during July, 2006.

Although perhaps the Board did not specifically authorize payments of this amount of salary the payments have not been disputed. The Board cannot turn a blind eye to the fact that the Church's pastor was somehow being paid. Management's lack of oversight does not transform into a liability of BDM.

Beyond payment for King, at least $22,829.26 of the loan proceeds were used for actual improvements, insurance,

-8-

Case: 08-03126    Doc# 65    Filed: 10/20/11    Entered: 10/21/11 10:14:51    Page 8 of 13

maintenance, repairs, etc. at the Church (Exhibit N), as follows:

| | |
|---|---|
| Sign-A-Rama | $404.97 |
| Home Depot | $843.27 |
| QuixTap | $653.08 |
| Best Musical | $429.56 |
| Golden State Painting | $7,500.00 |
| Central City Glass | $1,103.49 |
| Central Builders Ace Hardware | $41.32 |
| S F Hardware | $18.77 |
| GGI | $1,571.22 |
| Guide One Insurance | $9,736.75 |
| City & County of San Francisco | $150.00 |
| National Church Purchasing Group | $49.00 |
| PG & E | $87.91 |
| Sunset Scavenger | $112.59 |
| SF PUC | $77.24 |
| AT & T | $50.09 |
| **TOTAL** | **$22,829.26** |

Russell testified as to numerous other conditions that needed to be remedied at the Church, but BDM did not prove the amount expended on these problems. For reasons not clear to the court, additional receipts apparently exist but were not produced at trial. Without adequate proof the court cannot quantify this benefit beyond what is set forth above. Had the court decided that BDM was liable, this failure of proof might have cost BDM valuable credits.

The evidence also shows that substantial portions of loan

proceeds went right back to BDM as interest on the loans. From Exhibit 12 the court can locate ten check payments of $2,630.85 between June 2004 and December 2005. This is the exact monthly interest due on First Loan. Later the same exhibit shows six payments of $960.42, the monthly amount due on the Second Loan. And Aranda testified without contradiction that the First Loan and the Second Loan were current at the time Third Loan. From that the court finds that at least eleven more payments were made on the First Loan and one on the Second Loan.[3]

The evidence also shows that from the Wells Fargo account at least $116,000 went to Word (Exhibit 13), without authorization by Plaintiff's Board. As with the payments for King, these disbursements were, at worst, improper transfers made by Russell or Jamesetta Russell, but they were not caused by BDM's failure to ensure that there were three signatures on the loan documents.

To summarize the receipts and disbursements discussed above, $321,264.31 came in from the three loans and $293,877.33 went out for King, repairs and maintenance of the Church, debt service and to Word. If the difference, $27,386.98, was misappropriated, Plaintiff has not proven it and the court cannot speculate on the disbursements from the Wells Fargo account not explained nor consider it as damages to impose on BDM.

Plaintiff originally sued the lenders who made the three loans but subsequently entered into a compromise with them. To

---

[3] Members of Plaintiff loaned or advanced $148,000, of which $22,681.68 went to cure defaults on one or more of the loans, and another $50,400 serviced the loans for fourteen months, but the dates of those loans have not been shown and certainly the payments on the loans were not made from the Wells Fargo account.

-10-

the extent it recovers monies under that compromise it concedes there would be an offset against the amount it seeks to recover from BDM.[4] The fact that it expects such a recovery, presumably from a solvent title company, undermines the theory that it has been damaged at all, or at least for which BDM must be held accountable.

Although Russell caused some portion of the loans proceeds to be expended on account of Word, and provided no benefit to Plaintiff, $20,000 has been returned to Plaintiff. Further, Russell has entered into a settlement with Plaintiff such that if and when he pays up to $83,000 over time, such a recover further underscores the notion that BDM did not cause the damage.

IV CONCLUSION

BDM's conduct was not admirable and it should have been more careful in following basic principles of knowing who its borrower was and what that borrower was or was not authorizing. Despite that conduct it did not cause Plaintiff harm such that it should be held accountable under the theories presented. Had Russell asked that the loan proceeds be diverted to a separate account or discussed his plans with Aranda the results might be otherwise. The compensable harm was caused by Russell, Jamesetta Russell or Word, and BDM was not their guarantor. Stated otherwise, facilitating unauthorized loans that largely benefitted Plaintiff does not impose strict liability for wrongful conduct by the wrongdoers who diverted some of the loan proceeds.

---

[4] Plaintiff's counsel represented that a recovery of a settlement amount of $120,000 would be the subject of a noticed settlement motion within a few weeks of trial. No such settlement has been noticed.

-11-

BDM is entitled to judgment in its favor.  The court is
issuing such a judgment concurrently with this Memorandum
Decision.

* * * END OF MEMORANDUM DECISION * * *

SERVICE LIST

Stanley P. Lieber, Esq.
Lieber Williams & Labin
22130 Clarendon Street
Woodland Hills, CA 91367

-13-